**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | **CRIMINAL ACTION** |
| v. | ) ) | No. 13-10027-MLB |
| MAYRA PICENO and JOSE PICENO, | ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER**

This case comes before the court on defendant Mayra Piceno's motion to suppress. (Doc. 38). The motion has been fully briefed and is ripe for decision. (Docs. 46, 51). The court held an evidentiary hearing on September 4, 2013. The motion is granted for the reasons stated herein.

**I.   Facts**

On January 29, 2013, the Picenos were indicted on charges of money laundering. Jose Piceno was additionally charged with conspiracy to distribute a controlled substance.[1] Julian Soriano, a Drug Enforcement Agency (DEA) special agent in California, received a call from a DEA agent in Kansas concerning the investigation of the Picenos, who reside in Newman, California. Soriano was called to assist with the execution of the outstanding federal arrest warrants

---

[1] On September 11, 2013, a superceding indictment was returned by the grand jury charging both defendants with conspiracy to distribute. (Doc. 50).

for the Picenos.[2]

Soriano and other DEA agents established surveillance around the Picenos' home, 1319 Crabapple, in early February. Soriano confirmed that the Picenos lived at the residence. DEA performed a threat matrix to determine whether the use of a SWAT team would be necessary to execute the arrest warrants. The threat matrix was determined to be low and therefore, a SWAT team was not used.

On February 6, in the early hours of the morning, sixteen agents proceeded to the area of the Picenos' home to participate in the execution of the arrest warrants.[3] The sixteen agents arrived in approximately fourteen vehicles and positioned themselves in different locations around the area of the Picenos' home.

Around 7 o'clock in the morning, the agents closest to the home observed Jose Piceno leave in a vehicle with a young child. Two undercover vehicles followed Jose Piceno and observed him drop off the child at a school within a few blocks from the home. After dropping off the child, a marked unit stopped Jose Piceno. There were two agents in the marked unit and they placed Jose Piceno under arrest. After the arrest, the remaining agents, with the exception of a team that was watching the home, met to discuss the execution of Mayra Piceno's arrest warrant. The agents also changed into their tactical

---

[2] The arrest warrants were not introduced as evidence at the hearing. Soriano testified that he believed the warrants listed the charges as money laundering. The government contends that the money laundering charges stem from illegal drug activity and DEA agents do not investigate traditional white collar crimes which do not involve drugs. (Doc. 51 at 2).

[3] The court does not see the need to discuss the various agencies involved and will refer to all law enforcement officials as "agents."

gear and then returned to the home. The marked vehicle parked in front of the home and Jose Piceno remained handcuffed, in the back seat.

At approximately 8:30, Soriano and another agent approached the front door wearing tactical gear which said DEA in large letters. Both agents had their guns holstered. Two undercover agents were located next to the garage and wore face masks in addition to the tactical gear. Two agents had assault rifles and were also positioned by the garage.[4]

Soriano knocked on the door and Mayra Piceno answered the door carrying a baby. Mayra was wearing shorts and a tank top and did not have on shoes. The baby was in pajamas and did not have a blanket. Another small child was inside the home and sleeping in a bedroom. Soriano confirmed Mayra's identity and told her that there was an outstanding warrant for her arrest. Soriano then told her that she was under arrest and placed her in handcuffs. At this time, Mayra could see Jose positioned inside the police car. Mayra also observed other agents in the yard. An agent came up the steps and took the baby from Mayra.

Soriano then asked Mayra if he had consent to search her home for other individuals.[5] At least ten agents approached the home, with

---

[4] The photos of the home show that the agents would not be visible from the front door as long as they remained close to the garage door.

[5] Soriano testified that he requested consent to search the home at the time of Mayra's arrest. This testimony is disputed by Mayra's version of events. Mayra testified that Soriano asked to search the home to determine if there was anyone else inside. Mayra testified that she agreed to this and informed Soriano that her child was sleeping in a bedroom. Mayra testified that Soriano did not ask to

-3-

their weapons drawn, to execute the initial entry. The agents located the small child in the master bedroom and were inside the home for an extended period of time. During this time, Mayra and the baby were outside in the cold. Mayra asked for a blanket for the baby on several occasions. After ten minutes, the baby was placed inside a vehicle and given a blanket. Mayra was not given any additional clothing or shoes for a majority of the time she was outside.

At approximately 9:10, the Picenos and the baby were brought inside the home. The Picenos remained in handcuffs. The baby was crying and fussy.[6] Soriano brought Mayra Piceno into the kitchen and told her that he needed her to sign the written consent and stated that she had already given consent to search when they were outside the home. Soriano uncuffed one hand in order for Mayra to execute the consent to search form. The consent was written in Spanish, a language Mayra understood. Mayra did not ask any questions and signed the form which authorized the agents to search the home and three vehicles. Soriano asked Jose if the house belonged to him as well.

---

search the home until a later time when he presented the written consent to search. The court finds Mayra's testimony credible.
    The court does not find Soriano's testimony credible as to the verbal request for a search at the time of arrest. Soriano claims that he asked permission to search the home immediately after placing Mayra under arrest and that he asked Mayra, more than thirty minutes later and after an initial sweep, to sign the written consent while she was inside. Soriano's report, however, contradicts this version of events. The report states "Soriano showed MAYRA her arrest warrant, placed MAYRA in handcuffs, and asked MAYRA for a written consent to search her home to which she consented by reading, acknowledging a [sic] signing a DEA Consent to Search form." (Exh. 2 at 3). There is no dispute that the report's version of events did not occur. There is also no reasonable explanation for Soriano's testimony to contradict his report.

[6] The second baby continued to sleep in the bedroom at this time.

-4-

Jose stated that the house belonged to Mayra and another family member. Soriano did not ask Jose for his consent after concluding that it was not necessary to receive his consent.

During the search, drug-related items were seized. The Picenos remained handcuffed and were taken to jail at approximately 10:30. The agents called Child Protection Services and waited for a social worker to do an evaluation and determine a family member who could pick up the children.

Mayra Piceno moves to suppress the evidence seized from the home on February 6 on the basis that she did not voluntarily consent to a search of her home.

**II. Analysis**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., Amend. IV.

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 586 (1980) (citation omitted). It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. Id. That rule is subject only to a few carefully established exceptions. United States v. Jones, 701 F.3d 1300 (10th Cir. 2012).

One of the exceptions to the warrant requirement is a voluntary consent to enter or search a residence. Id. at 1317. "Voluntary

consent consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." Id. The government bears the burden of proving consent was voluntarily and freely given. Further, the question is one of fact to be determined from the totality of all the circumstances. Id. at 1318.

When considering the totality of the circumstances, the court is to consider the following:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his Miranda rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

Jones, 701 F.3d at 1318.

First, the court must determine if consent was given. The government contends that a verbal consent was given at the door and, additionally, the written consent was obtained inside the house. The facts established at the hearing, however, show that Soriano did not ask to search the house at the time of the arrest. Instead, Soriano requested entrance in order to check for additional adults who may be in the home. Therefore, the court finds that Soriano did not ask for nor receive verbal consent to search the home after Mayra was placed under arrest.[7]

Next, there is no dispute that Mayra signed the written consent

---

[7] Nevertheless, even if Soriano had asked for and received verbal consent at the door, the court would not find the consent to be freely and voluntarily given for the reasons discussed infra.

-6-

form and that she reads and understands Spanish. The question before the court is whether her written consent was freely and voluntarily given based on the totality of the circumstance.

Consent is voluntary if, in light of all the circumstances, a reasonable person would have felt free to decline the request to consent. United States v. Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007). In reviewing the totality of the circumstances, the court finds that several facts weigh in favor of a finding that Mayra's consent was not freely and voluntarily given. At the time Mayra was asked to sign the consent form, Mayra was in handcuffs and her baby was crying in another room. Moreover, Mayra had been in handcuffs for an extended period of time and had also been outside of the home for more than thirty minutes in the cold, early morning wearing only a tank top and no shoes. Mayra's husband was in handcuffs and in another room in the home at the time she was asked for consent. These facts support a finding that Mayra was distressed due to her concern for her husband and her children. Considering that a "protective sweep" had been completed and no person or item was found which presented a threat to the agents, no reasonable explanation was given, nor could one credibly be given, for Mayra Piceno's treatment by the agents.

The fact that tips the scales in this case, however, was the presence of approximately sixteen agents inside her home. The majority of the agents were wearing tactical gear and two had assault rifles and ski masks. The overwhelming presence of an unnecessarily large number of agents in her home resulted in further distress to Mayra.

Finally, while Soriano did not have to specifically inform Mayra that she had the right to refuse to consent to a search, United States v. Zapata, 997 F.2d 751, 757 n. 4 (10th Cir. 1993), Soriano misled Mayra by stating that she had already authorized a search and left little room for choice when Soriano stated that she "needed" to sign the form. Additionally, Mayra was never informed of her Miranda rights. Jones, 701 F.3d at 1318 (the failure to give Miranda rights is a factor to consider when determining voluntariness).

Taking into account the totality of the circumstances, the court finds that Mayra did not freely and voluntarily consent to a search of her residence. See United States v. Hurston, 12 F. Supp.2d 630, 639 (E.D. Mich. 1998)(consent was not voluntarily when eleven officers were in the home and defendant's young children were crying and defendant was distressed).

**III. Conclusion**

Defendant Mayra Piceno's motion to suppress is granted.[8] (Doc. 38).

IT IS SO ORDERED.

Dated this __17th__ day of September 2013, at Wichita, Kansas.

    s/ Monti Belot
    Monti L. Belot
    UNITED STATES DISTRICT JUDGE

---

[8] Defendant Jose Piceno did not file a motion to join. However, the facts introduced at the hearing suggest that Jose lived in the home with Mayra. Therefore, it is highly likely that he has standing to object to the search. Minnesota v. Olson, 495 U.S. 91, 96-97, 110 S. Ct. 1684 (1990).